## McCormick & Fisher v. Local Unions 216 et al.

1. PEACEABLE ARGUMENT AND PERSUASION TO DIVERT TRADE FROM BUSI- NESS NOT UNLAWFUL BOYCOTT.

Peaceable persuasion and argument, oral, printed or written, by members not officers of labor unions to divert patronage from a hotel claimed by them to be "unfair to labor" will not be en- joined as an unlawful boycott.

2. COERCIVE MEASURES BY LABOR UNION TO MAINTAIN BOYCOTT ENJOIN- ABLE.

Injunction will lie to restrain coercive measures by labor unions in the maintenance of a boycott against a hotel claimed to be "unfair to labor." Whether or not such claim is well-founded is immaterial.

3. RESTRAINT BY EQUITY OF COERCIVE MEASURES, OR VIOLENCE TO MAIN- TAIN BOYCOTT, NO VIOLATION OF RIGHT TO JURY TRIAL OR FREEDOM OF THE PRESS.

Coercive measures to enforce a boycott may consist of violence or any form of intimidation such as threats, oral, printed or written. The restraint of such unlawful acts by a court of equity does not violate any right of trial by jury or any con- stitutional provisions as to the freedom of speech or the press.

4. PASSING OF CARDS THREATENING TO PUBLISH NAMES OF PATRONS OF BOYCOTTED HOTEL MAY BE ENJOINED.

The distribution by pickets in a labor union boycott, of cards warning patrons of a hotel and saloon not to patronize the place as unfair, and threatening to publish the names of any who do so may be enjoined.

[Syllabus by the court.]

APPEAL.

*Sala & Carabin*, for plaintiffs:

Cited and commented upon the following authorities: Martin, Labor Unions Secs. 30, 35, 40, 55, 28, 29, 69, 72, 74, 75, 76, 82, 84, 85, 86, 88, 89, 90, 95, 96, 100-102, 106; *Plant* v. *Woods*, 176 Mass. 492 [57 N. E. Rep. 1011; 51 L. R. A. 339; 79 Am. St. Rep. 330]; *Berry* v. *Donovan*, 188 Mass. 353 [74 N. E. Rep. 603; 5 L. R. A. (N. S.) 899; 108 Am. St. Rep. 499]; *Gray* v. *Trades Council*, 91 Minn. 171 [97 N. W. Rep. 663; 63 L. R. A. 753; 103 Am. St. Rep. 477; 1 Ann. Cas. 172]; *Booth* v. *Bur-*

Lucas County.

*gess,* 72 N. J. Eq. 181 [65 Atl. Rep. 226]; *Jonas Glass Co.* v. *Glass Bottle Blowers' Assn.* 72 N. J. Eq. 653 [66 Atl. Rep. 953]; *Barnes* v. *Berry,* 156 Fed. Rep. 72; *Curran* v. *Galen,* 152 N. Y. 33 [46 N. E. Rep. 297; 37 L. R. A. 802; 57 Am. St. Rep. 496]; *Purvis* v. *United Brotherhood (Local),* 214 Pa. St. 348 [63 Atl. Rep. 585; 12 L. R. A. (N. S.) 642; 112 Am. St. Rep. 757; 6 Ann. Cas. 275]; *American Fed. of Labor* v. *Stove & Range Co.* 33 Dist. Col. 83; *Perkins* v. *Pendleton,* 90 Me. 166 [38 Atl. Rep. 96; 60 Am. St. Rep. 252]; *State* v. *Dyer,* 67 Vt. 690 [32 Atl. Rep. 814]; *Hopkins* v. *Stave Co.* 83 Fed. Rep. 912 [28 C. C. A. 99; 49 U. S. App. 709]; *Crump* v. *Commonwealth,* 84 Va. 927 [6 S. E. Rep. 620; 10 Am. St. Rep. 895]; *Reynolds* v. *Davis,* 198 Mass. 294 [84 N. E. Rep. 457; 17 L. R. A. (N. S.) 162]; *Beck* v. *Teamsters' Pro. Union,* 118 Mich. 498 [77 N. W. Rep. 13; 42 L. R. A. 407; 74 Am. St. Rep. 421]; *Loewe* v. *Lawlor,* 208 U. S. 274 [28 Sup. Ct. Rep. 301; 52 L. Ed. 488]; *State* v. *Glidden,* 55 Conn. 46 [8 Atl. Rep. 890; 3 Am. St. Rep. 23]; *Lucke* v. *Cutters' & Trimmers' Assembly,* 77 Md. 396 [26 Atl. Rep. 505; 19 L. R. A. 408; 39 Am. St. Rep. 421]; *Funck* v. *Elevator Co.* 142 Iowa 621 [121 N. W. Rep. 53; 24 L. R. A. (N. S.) 108]; *Jackson* v. *Stanfield,* 137 Ind. 592 [36 N. E. Rep. 345; 37 N. E. Rep. 14; 23 L. R. A. 588]; *Walker* v. *Cronin,* 107 Mass. 555, 567; *Graham* v. *Railway,* 47 La. Ann. 214 [16 So. Rep. 806; 27 L. R. A. 416; 49 Am. St. Rep. 366]; *Delz* v. *Winfree,* 80 Tex. 400 [16 S. W. Rep. 111; 26 Am. St. Rep. 755]; *Gatzow* v. *Buening,* 106 Wis. 1 [81 N. W. Rep. 1003; 49 L. R. A. 475; 80 Am. St. Rep. 17]; *Jersey City Ptg. Co.* v. *Cassidy,* 63 N. J. Eq. 759 [53 Atl. Rep. 230]; *Jones* v. *Gin & Machine Wks.* 131 Ga. 336 [62 S. E. Rep. 236; 17 L. R. A. (N. S.) 848; 127 Am. St. Rep. 235]; *Doremus* v. *Hennessy,* 176 Ill. 608 [52 N. E. Rep. 924; 54 N. E. Rep. 524; 43 L. R. A. 797; 68 Am. St. Rep. 203]; *Moores* v. *Bricklayers' Union,* 10 Dec. Re. 665 (23 Bull. 48), affirmed, no op., *Bricklayers' Union* v. *Moores,* 51 Ohio St. 605; *Parker* v. *Bricklayers' Union,* 10 Dec. Re. 458 (21 Bull. 223), affirmed, no op., *Bricklayers' Union* v. *Parker,* 51 Ohio St. 603; *Humphryes Mfg. Co.* v. *Matthias,* 12 Dec. 517; *Brunsman* v. *Atherton,* 12 Dec. 547; *Dayton Mfg. Co.* v. *Polishers Union,* 11 Dec. 643 (8 N. P. 574); *Hillenbrand* v. *Building Trades Council,* 14 Dec.

McCormick v. Local Unions 216.

628; *Eureka Foundry Co. v. Lehker,* 13 Dec. 398; *Martin v. McFall,* 65 N. J. Eq. 91 [55 Atl. Rep. 465]; *Lohse Patent Door Co. v. Fuelle,* 215 Mo. 421 [114 S. W. Rep. 997; 22 L. R. A. (N. S.) 607; 128 Am. St. Rep. 492]; *Wilson v. Hey,* 232 Ill. 389 [83 N. E. Rep. 928; 122 Am. St. Rep. 119]; *Jensen v. Cooks' and Waiters' Union,* 39 Wash. 531 [81 Pac. Rep. 1069; 4 L. R. A. (N. S.) 302]; *Casey v. Typographical Union,* 6 O. F. D. 698 [45 Fed. Rep. 135]; *Goldberg v. Stableman's Union,* 149 Cal. 429 [86 Pac. Rep. 806; 8 L. R. A. (N. S.) 460; 117 Am. St. Rep. 145; 9 Ann. Cas. 1219]; *Mulholland v. Waiters' Local Union,* 13 Dec. 342, 343; *Loewe v. Federation of Labor,* 139 Fed. Rep. 71; *Gray v. Building Trades Council,* 91 Minn. 171 [97 N. W. Rep. 663; 63 L. R. A. 753; 103 Am. St. Rep. 477; 1 Ann. Cas. 172]; *Ertz v. Produce Exchange,* 79 Minn. 140 [81 N. W. Rep. 737; 48 L. R. A. 90; 79 Am. St. Rep. 433]; *Barr v. Essex Trades Council,* 53 N. J. Eq. 101 [30 Atl. Rep. 881]; *Barnes v. Typographical Union,* 232 Ill. 424 [83 N. W. Rep. 940; 14 L. R. A. (N. S.) 1018; 13 Ann. Cas. 54]; *Vegelahn v. Gunter,* 167 Mass. 92 [44 N. E. Rep. 1077; 35 L. R. A. 722; 57 Am. St. 443]; *Maryland Lodge v. Adt,* 100 Md. 238 [59 Atl. Rep. 721; 68 L. R. A. 752]; *Seattle Brew. Malt. Co. v. Hansen,* 144 Fed. Rep. 1011; *Parkinson v. Building Trades Council,* 154 Cal. 581 [98 Pac. Rep. 1027; 21 L. R. A. (N. S.) 550; 16 Ann. Cas. 1165]; *Lindsay v. Federation of Labor,* 37 Mont. 264 [96 Pac. Rep. 127; 18 L. R. A. (N. S.) 707; 127 Am. St. Rep. 722]; *Marx & Haas Jeans Cloth. Co. v. Watson,* 168 Mo. 133 [67 S. W. Rep. 391; 56 L. R. A. 951; 90 Am. St. Rep. 440]; *Buck Stove & Range Co. v. Federation of Labor,* 35 Wash. L. Rep. 797; *Sherry v. Perkins,* 147 Mass. 212 [17 N. E. Rep. 307; 9 Am. St. Rep. 689]; *Coeur D A'lene Con. Min. Co. v. Miners' Union,* 51 Fed. Rep. 260; *Wilson v. Hey,* 232 Ill. 389 [83 N. E. Rep. 928; 16 L. R. A. (N. S.) 85; 122 Am. St. Rep. 119; 13 Ann. Cas. 82]; *Judson v. Zurhorst,* 30 O. C. C. 9 (10 N. S. 289), affirmed, no op., *Judson v. Zurhorst,* 78 Ohio St. 446; *National Protective Assn. v. Cumming,* 170 N. Y. 315 [63 N. E. Rep. 369; 58 L. R. A. 135; 88 Am. St. Rep. 648]; *Jacobs v. Cohen.* 183 N. Y. 207 [76 N. E. Rep. 5; 2 L. R. A. (N. S.) 292; 111 Am. St. Rep. 730; 5 Ann. Cas. 280]; *Pierce   v.   Stablemen's*

Lucas County.

*Union,* 103 Pac. Rep. 324 (Cal.); *Marlin Firearms Co.* v. *Shields,* 171 N. Y. 384 [64 N. E. Rep. 163; 59 L. R. A. 310]; *Emack* v. *Kane,* 34 Fed. Rep. 46; 2 Story, Eq. Jurisp. Sec. 948a; 6 Pomeroy, Eq. Jurisp. Sec. 629; *Farquhar* v. *National Harrow Co.* 102 Fed. Rep. 714 [42 C. C. A. 600; 49 L. R. A. 755]; *Prudential Ins. Co.* v. *Knott,* 10 Ch. App. Cas. 142; *Springhead Spinning Co.* v. *Riley,* L. R. 6 Eq.; *Consolidated Steel & Wire Co.* v. *Murray,* 10 O. F. D. 205 [80 Fed. Rep. 811]; *Debs, In re,* 158 U. S. 564 [15 Sup. Ct. Rep. 900; 39 L. Ed. 1092].

*Charles Lawton,* for defendants:

Cited and commented upon by the following authorities: *Ulery* v. *Livestock Exchange,* 54 Ill. App. 233; *Riggs* v. *Waiter Alliance Local 58,* 8 Dec. 565 (5 N. P. 386); *Richter* v. *Tailors Union,* 11 Dec. Re. 45 (24 Bull. 189); *Judson* v. *Zurhorst,* 30 O. C. C. 9 (10 N. S. 289); *Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581 [98 Pac. Rep. 1027; 21 L. R. A. (N. S.) 550; 16 Ann. Cas. 1165]; *Lindsay* v. *Federation of Labor,* 37 Mont. 264 [96 Pac. Rep. 127; 18 L. R. A. (N. S.) 707; *Marx & Hass Jean Cloth. Co.* v. *Watson,* 168 Mo. 133 [67 S. W. Rep. 391; 56 L. R. A. 951; 90 Am. St. Rep. 440]; *Ricard Boiler & Engine Co.* v. *Benner,* 14 Dec. 357; *People* v. *Radt,* 71 N. Y. Supp. 846; *State* v. *Jacobs,* 10 Dec. 252 (7 N. P. 261).

**WILDMAN, J.**

The plaintiffs, owning and operating as partners the Grand Hotel on Adams street in this city, and in connection therewith a saloon and restaurant, in May, 1910, became involved in a dispute with the defendant associations named in the title of the case, which are voluntary unincorporated labor organizations, and officers of the same. The trouble arose over the retention in the service of the plaintiffs of certain bartenders, members of the defendant unions, after request of those organizations that they be discharged from the plaintiffs' employment because they were in default for their dues as such members and were therefore not in good standing.

As an outcome of the dispute, on or about May 12, 1910, a boycott was organized and pickets were posted on the side-

McCormick v. Local Unions 216.

walks in front of said hotel, saloon and restaurant, to distribute printed cards containing notices or information that said hotel was "unfair" to labor, and requesting friends of labor not to patronize it. The cards prepared for this purpose and distributed by said pickets varied somewhat in their phraseology, but were all designed to divert patronage from the hotel named. They were all persuasive in character, rather than mandatory or threatening, except that on the backs of some of them, the precise time of the distribution of which is not made clear by the evidence, was printed a warning notice as follows: "Names of Business Men patronizing the Unfair *Hotel Grand* will be published."

The boycott so inaugurated has continued to the present time, to the heavy financial loss of the plaintiffs, as they assert.

August 12, 1910, the plaintiffs filed their petition in the court of common pleas, asking an injunction to restrain all said acts and all interference with their employes and patrons. The action having come into our court by appeal, two of its members, Judge Parker and myself, on October 14, 1910, allowed a temporary injunction in the following terms.

"This 14th day of October, 1910, this cause came on to be heard before the Hons. R. S. Parker, R. R. Kinkade and S. A. Wildman, judges of the circuit court in and for Lucas county, Ohio, at chambers in Toledo, Ohio, on the motion of the plaintiffs for a temporary injunction as prayed for in their petition and the evidence and was argued by counsel; on consideration whereof it is hereby ordered by the undersigned the said judges R. S. Parker, and S. A. Wildman that the defendants and each of them be and they are hereby enjoined until otherwise ordered herein from interfering with said plaintiffs, or their patrons or persons going to or from their said premises, by threats, oral, printed or written of injury to their persons, property or business, or by insults, personal violence, or other forms of intimidation, or from entering in and upon the premises of the plaintiffs, against the will of the latter, or in any manner keeping or endeavoring to keep any person or persons against the will of such person or persons from becoming or remaining patrons of the plaintiff; and to this extent said motion is sustained;

Lucas County.

But in so far as said motion seeks to restrain the defendants from standing or walking on the sidewalk, or street, on which plaintiffs' said premises abut, and there or elsewhere, without insults, threats, violence or other intimidation, persuading or attempting to persuade persons not to patronize plaintiffs, said motion is hereby overruled.''

I have quoted this order as journalized, in full, because of some misunderstanding which seems to have arisen immediately after its rendition as to its terms.

It is not apparent, however, from any of the supplementary evidence which has been submitted to us, that, since the entering of this order, it has been in any manner disobeyed. Picketing in the vicinity of the hotel has been continued and printed cards have been distributed, but no intimidation or coercion has apparently been resorted to to divert patronage.

Unless the mere maintenance of a peaceable boycott is sufficient to justify an exercise of the restraining power of a court of equity, we should not in any final decree enlarge the scope of the interlocutory order already made as I have quoted it. That order was directed at coercion, not persuasion.

After an earnest consideration of the facts disclosed by all the evidence and numerous expressions of views entertained by courts and text writers, it is a matter of regret that the members of our court find themselves not wholly in accord. To a majority of us, however, it seems not only just, but abundantly sustained by the authority of eminent jurists, that any combination of persons to effect a diversion of trade or patronage from another person, firm or corporation by violence, threats, intimidation or other form of coercion, must be deemed unlawful, and that to prevent such acts a court of equity should not withhold its protection when its powers are invoked.

On the other hand, for myself at least, I cannot accept the doctrine expressed by some writers and judges, that while an individual may lawfully withdraw his patronage from any person or concern, a labor union or other combination of persons may not lawfully do the same thing; or that while an individual may lawfully ask his friends to withdraw their patronage from any institution which he deems unfair to him or unfriendly to

his interests, numerous individuals may not, severally or in combination, likewise do so.

While the numerous and rapidly multiplying authorities treating the troublesome question arising in disputes between capital and labor cannot be harmonized, the view which seems to me just, that acts which are lawful to individuals are equally so to combinations of individuals where not prohibited by statute, finds some support in the language of Judge Taft in the case of *Moores v. Bricklayers' Union*, 10 Dec. Re. 665, 668 (23 Bull. 48), affirmed, no op.; *Bricklayers' Union v. Moores*, 51 Ohio St. 605.

The same case, so affirmed, is authority for the position taken by us in the interlocutory order, that coercive means, although for an end not unlawful, will be restrained by a court of equity.

A majority of the court is disposed to adhere to this position. I will not attempt the citation of authorities to sustain it, but will content myself with two brief quotations from the recently published treatise of Martin, Law of Labor Unions Secs. 75, 76, p. 115:

"A combination of workmen formed for the purpose of coercing the customers or prospective customers of one against whom it is directed to withhold their patronage from him is almost universally held to be an unlawful conspiracy."

"According to the great weight of authority it is an unlawful conspiracy for a combination of workmen to combine to coerce one's customers or prospective customers to withhold their patronage from him by threats that in case they fail or refuse to do so, the combination will in turn cause injury to their business by causing loss of patronage."

The author of this treatise is also reviewing editor of the Cyc. Law & Proced., and seems to have collated the numerous adjudications on the subject.

Our examination of the evidence before us leads to the conclusion that in at least the earlier stages of the boycott against the Grand Hotel the distinction between lawful, peaceable persuasion and unlawful coercion was not sufficiently regarded by the members and agents of the unions by whose authority

printed tickets were procured and distributed in front of the hotel. Not all the officers of the unions or their agents are shown to have used other then legitimate means for the accomplishment of the concerted purpose, but some, over-zealous, seem to have forcibly interfered to prevent patronage of the hotel.

It is too familiar a rule to require citation of authority that the acts of one member of a combination in furtherance of a common end must be deemed the acts of all.

We are also inclined to the view that the cards circulated at some stage of the proceedings bearing words of warning to patrons of the hotel that their names would be published, carried an implied threat that the result would be injurious to them. Otherwise, the notice would have had no deterrent effect and would have been futile as a means of furthering the boycott.

That the result of all these acts, persuasive and coercive, has been a heavy loss of patronage to the plaintiffs, and that it is utterly impracticable to measure in damages the extent to which such loss has been or may be enhanced by such of them as we have described as overstepping legal bounds, is clearly disclosed by the evidence, so that, even without the admission made in, the record that the defendants are insolvent, no legal remedy is apparent, and the plaintiffs were justified in the institution of the action.

It is the judgment of a majority of the court that the temporary injunction heretofore allowed against the defendants should be made perpetual, and such will be the decree. We do not feel called upon to discuss the question urged in argument by counsel, whether the boycott was or was not justified by any unfair attitude of the plaintiffs toward labor, or whether the distributed cards were true or libelous. Even if they were all libelous, the court, as we held in *Judson* v. *Zurhorst*, 30 O. C. C. 9 (10 N. S. 289), would not enjoin their circulation for that reason.

Authority for injunction against voluntary unincorporated associations, their officers, and members, is found in the case of *Hillenbrand* v. *Building Trades Council*, 14 Dec. 628, 629 and the numerous decisions cited in the opinion.

**Parker, J.,** concurs.

**KINKADE, J.,** dissenting.

In this case the defendants are charged with soliciting persons not to patronize the Grand Hotel owned by the plaintiffs, for the reason, as stated by defendants in making such requests, that the hotel was unfair to union labor. These requests were courteously made on the public street of persons going to and coming from the hotel, and of the public generally, in passing by the hotel, by means of personal requests on the street and by the use of printed cards handed to various persons on the street by the defendants. Different statements were made, and several different forms of printed cards were used, but all, with one exception (hereafter mentioned), were of the same general tenor and effect, that is to say, they were requests to the friends of union labor not to patronize the hotel for the reason above stated. One card, used for a very short time and then abandoned, gave notice that the names of persons patronizing the hotel would be published. Certain acts of violence are charged against the defendants, which I think the evidence fails to establish. During the time of the alleged boycott, the plaintiffs, aided by the Citizens' Industrial Alliance, an antilabor union organization, caused to be printed and circulated generally throughout the city, cards stating that a boycott was on against their hotel, and requesting the public to disregard the boycott and continue its patronage of the hotel, and thereby rebuke the methods of the labor unions. The plaintiffs also had painted and hung in the front window of the hotel a large banner, giving notice to all who passed that that was the place that was boycotted.

A great deal of the evidence found in the record appears to have been offered by both sides as bearing upon the question whether the hotel proprietors, plaintiffs here, were in fact unfair to union labor, whether the defendants were or were not justified in determining, as they did, that the hotel was unfair to union labor. We are unanimous in the opinion that practically all of this evidence is quite immaterial in considering the real questions here involved. No more need be said of this feature of the case than that the proprietors of the hotel thought the defendants had no just complaint against them, and that the defend-

ants were equally sure that they had. We deem it wholly un-
necessary to pass upon the relative merits of these claims in
order to determine the real questions arising here.

The question of the liberty of speech and of the press is
squarely made in this case, and the parties are entitled to have
the question squarely passed upon by the court. The chief
counsel for the plaintiffs, in the opening of his argument, with
commendable frankness stated that while that which had taken
place was of serious consequence to the plaintiffs, yet the prin-
ciples involved in the case were of far greater importance to the
public generally.

The plaintiffs ask that all of the individual defendants
named, as well as all other members (though not named in-
dividually) of the two local unions, defendants in this action,
and also the two local unions as well, be perpetually enjoined
from soliciting persons not to patronize the Grand Hotel, and
from giving out to the public any statement that the Grand
Hotel is unfair to union labor. A majority of the court are of
the opinion that an injunction should be granted on behalf of
the plaintiffs, as indicated by the opinion just delivered.

I cannot concur in the decision of the majority of this court.

In my opinion, no court in Ohio has the power to restrain,
by injunction, the liberty of speech or of the press. The whole
subject is fully covered by Art. 1, Sec. 11 Const. of Ohio, which
reads as follows:

"Every citizen may freely speak, write and publish his
sentiments on all subjects, being responsible for the abuse of the
right; and no law shall be passed to restrain or abridge the
liberty of speech, or of the press. In all criminal prosecutions
for libel, the truth may be given in evidence to the jury, and
if it shall appear to the jury, that the matter charged as libelous
is true, and was published with good motives, and for justifiable
ends, the party shall be acquitted."

There is no uncertainty in this provision of the constitution.
The language is simple, plain and very broad in its scope, and
if this provision does not insure the citizens of Ohio against
censorship of speech and of the press, by injunction, it may well
be doubted whether anything could be written which would. No

one doubts but what the abuse of the right of free speech can be and ought to be punished. The section of the constitution quoted clearly contemplates this, and the legislature has full power to enact all necessary laws in this regard. But there can be no abuse of the right until there is an exercise of the right. I think the question whether there has been an abuse of the right in any case should be determined by a jury under proper instructions from the court, and not by a judge. With all due respect for the opinions of others who entertain views at variance with my own on this subject, I feel obliged to say that I regard the restraining of the freedom of speech or of the press, by injunction, as the exercise of a power plainly prohibited by the constitution. It is my firm conviction that no court should ever be clothed with any such power. Punishing the abuse of the right of free speech is one thing (and is entirely proper), but the muzzling of the citizen or the press, with an injunction, so there can be no exercise of the right of free speech, is a very different thing, and in my opinion is a very dangerous thing.

The constitution does not direct the legislature or the courts to determine to what extent we shall have free speech or a free press, but, on the contrary, the constitution itself grants to "every citizen" the right to "freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of the right" and then adds "and no law shall be passed to restrain or abridge the liberty of speech or of the press."

The legislature has never attempted to pass any law narrowing this provision of the constitution, or in any way denying the rights therein granted, and were it to do so, the courts would very promptly, and very properly, declare such a law unconstitutional.

The language of the constitution is so very plain, it needs only to be read to be fully understood by any one. Unless something be read into the section that is not there, or a portion of what is there be disregarded, I am unable to see how an injunction restraining the freedom of speech or of the press can possibly be in accord with the constitution.

It is a fact that practically all of the encroachments upon the right of free speech and a free press, up to date, have been

made by the courts themselves, the sworn defenders of the constitution. Doubtless they have regarded the urgency of the ends sought as a justification of the extraordinary means employed, even to the extent of denying the right of trial by a jury; but to these extremes I must respectfully decline to go.

No greater mistake can be made than to underestimate the importance of free speech and of a free press. These rights are among the strongest bulwarks of liberty. It is our duty to guard them with jealous care, and this duty should appeal with peculiar force to the courts. They should never lend their assent or assistance to the weakening or paralyzing of those constitutional rights, without which liberty cannot long exist.

The Supreme Court of the United States, in a case involving the boundary line of states where marked by rivers, discussed the question of the shifting of the boundary line by reason of the bank of the river slowly wearing away on one side and accumulating on the other. They held that land thus accumulated, by accretion, upon one side of a river, belonged to the state upon that side, and that the boundary line between the states shifted accordingly (not so where the river changed its course suddenly, as by a freshet. In such case the boundary line is not altered). In that case the Supreme Court defined the word "accretion" as meaning, "something which you can see has taken place, but which you cannot see take place."

If some of the courts which have issued injunctions in labor troubles were inquired of as to the source of their power to go to the lengths they have gone in some cases in restraining, by injunction, breaches of the peace and violations of the criminal law generally, they might be compelled to answer "we got it by accretion, by the gradual wearing away of the power of the executive branch of the government as aided by the regular criminal courts, and a corresponding increase in power, by accretion, on the part of courts of equity, to substitute the injunction for the neglect of duty on the part of executive officers and in the place of jury trials in the regular criminal courts." They might add "Of course no one saw us get this power, but all now know that the ancient boundary lines have shifted and that we are now exercising the power."

McCormick v. Local Unions 216.

We may admit the existence of a power, and still deny the wisdom of exercising it except in extraordinary cases, and then only with very great caution. It is very easy to issue an injunction, and it is a very ready and summary method for the court to determine, without the aid of a jury, whether there has been a violation of the order. No one doubts the simplicity or efficiency of injunction procedure; these are the qualities that render it attractive to people who prefer, when it better suits their own purposes, to omit the limitations and restraints incident to jury trials. Were these same people themselves on trial for a violation of the criminal law, they would stand aghast if any one suggested that the jury be dispensed with and that they be tried by the court, they would be amazed, and justly so, at both the ignorance and the effrontery of any one who would thus seek to deny them their constitutional rights.

I want to say, with all the seriousness and emphasis at my command, that in my humble opinion the reckless use of the writ of injunction is itself producing an injury that may well be described as irreparable. I refer to the impairing of the confidence of the people generally in the courts. We have certainly reached the danger line.

I wish to say, concerning this case, that in my opinion the evidence here fails to show that the plaintiffs are entitled to the relief asked for. I have read every word of the evidence in this record, including the exhibits attached, and without taking time to review it in detail, will say that I think we should dismiss the petition of the plaintiffs at the plaintiffs' costs.